UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JOSEPH DI GIOVANNA,

                Plaintiff,

             -against-                       08 Civ. 02750 (LAK)

BETH ISRAEL MEDICAL CENTER, et al.

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

        Appearances:

                    Louis Ginsberg
                    THE LAW FIRM OF LOUIS GINSBERG, P.C.
                    *Attorney for Plaintiff*

                    Roy J. McEvoy
                    Shari A. Alexander
                    EDWARDS ANGELL PALMER & DODGE, LLP
                    *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

        Joseph Di Giovanna, former director of revenue cycle operations at Beth Israel Medical Center ("BIMC"), brings this action seeking damages under the Family and Medical Leave Act ("FMLA").[1]  He alleges that BIMC and Continuum Health Partners, Inc. ("Continuum")

---

[1]   29 U.S.C. §§ 2601 *et. seq.*

2

improperly interfered with his exercise of FMLA rights.  He alleges also that defendants fired him

for exercising those rights and for opposing defendants' interference with the FMLA rights of himself

and other employees.  The matter now is before the Court on defendants' motion for summary

judgment dismissing the complaint.[2]

*Fact*s

Di Giovanna began working at BIMC as director of revenue cycle operations for the

patient accounts department in July 2005.[3]  Patient accounts is one of six departments in "Patient

Financial Services," which is headed by Kathy Dakis and was responsible for collecting money owed

to BIMC and other affiliated hospitals from private insurance companies.[4]  The timely collection of

money owed to BIMC by private insurers is essential to its financial health and its ability to provide

quality care, and the patient accounts department handles billing and collecting in-patient and out-

patient accounts receivable.   Allise Williams ran the patient accounts department during Di

Giovanna's employ with BIMC,[5]

---

[2]

        Continuum seeks dismissal from the action on the ground that it was not Di Giovanna's employer and thus cannot be held liable under the FMLA.  For reasons that will appear, the Court need not address this issue.

[3]

        Def.. 56.1 St.  ¶¶ 3-4; Joint Pretrial Order ("PTO") Stipulated Facts ¶ 3.

[4]

        *Id*. ¶¶  6-7, 11.  In his Rule 56.1 rebuttal statement, plaintiff purports to deny this (and numerous other) asserted fact by stating that he denies "knowledge and information about the statement."  To whatever extent this is an attempt by plaintiff to create a genuine issue of fact regarding the assertion, it fails.

[5]

        Def. 56.1 St. ¶¶ 10, 12, 14-15.

Di Giovanna was in charge of both the Blue Cross-Blue Shield ("BCBS") and commercial managed care ("CCMC") units, both of which collected money from insurers.  He was in charge also of the payment review and denial unit ("PRDN"), which handled claims that were denied or underpaid by insurance companies.  Managers, supervisors and staff reported to him.[6]

In February 2006, Williams took medical leave, and Di Giovanna began reporting directly to Dakis.  Upon Williams' return to work in May 2006, however, Dakis decided to have PRDN report to Williams rather than Di Giovanna.[7]

*Di Giovanna's FMLA Leave*

The FMLA affords eligible employees an "entitlement" to twelve works of unpaid leave per year.[8]  Caring for a parent with a serious health condition is one ground for FMLA leave,[9] and such leave "may be taken intermittently or on a reduced leave schedule when medically necessary."[10]

Di Giovanna's father was diagnosed with cancer in November 2006.  Di Giovanna informed his supervisors, Williams and Dakis, about his father's condition and the possibility of

---

[6]    Def. 56. St. ¶¶ 21-22, ¶ 26.

[7]    Def. 56.1 St. ¶¶ 34, 41.  Di Giovanna disputes the reason for the switch but not that the switch occurred.  *Compare* Pl. 56.1 St. ¶ 41 *with* Di Giovanna Dep. 48:25-49:10; 49:18-22.

[8]    29 U.S.C. §2612(a)(1).

[9]    *Id.* § 2612(a)(1)(C).

[10]    *Id.* § 2612(b)(1).

4

needing time off to care for him.  Over the next six months, Di Giovanna used vacation and sick days to care for his father, all with the approval of Dakis or Williams.[11]

       The parties agree that Di Giovanna informed Dakis in February 2007 that his father's condition was deteriorating.[12]  According to Di Giovanna, this was one of several instances in which either Dakis or Williams "discouraged" him from taking intermittent FMLA leave and, in the case of Williams, "directed" him not to do so.[13]  Defendants deny ever discouraging from filing or directing Di Giovanna not to file for FMLA leave, let alone retaliating against him for doing so.

       In April 2007, Di Giovanna requested a letter of recommendation from Williams for a college course he was taking.  Di Giovanna drafted the letter and, after making some grammatical changes, Williams signed it.[14]

       Di Giovanna completed an application for intermittent FMLA leave on May 15, 2007, which was signed by Williams and approved by Liberty Mutual for the period May 14, 2007 to May 12, 2008.[15]

---

[11]    Def. 56.1 St.  ¶¶ 47, 51.

[12]    *Id.* ¶ 58.

[13]    *See* Pl. Br. at 2, 12, 17; Pl. 56.1St. ¶ 58; Di Giovanna Dep. 212-13.

[14]    Def. 56.1 St. ¶¶ 65-67; *see also* Ex. 10 to Di Giovanna Dep. (copy of letter).

[15]    PTO Stipulated Facts ¶ 4; Def. 56.1 St. ¶ 70-71, ¶ 74.

    As BIMC's insurance carrier, Liberty Mutual made the ultimate decision regarding FMLA leave applications.  *See e.g.*, Def. 56.1 St. 68-9, 71, 74.

Di Giovanna received a written performance evaluation from Williams on July 2, 2007.[16] Shortly afterwards, Williams informed Di Giovanna that he would not receive a merit-based raise.[17] Dakis later confirmed in an email to the human resources department that, based on their performance evaluations, Di Giovanna and two other employees in patient accounts did not warrant the three percent merit increases given to employees at that time.[18]

Williams met with Di Giovanna again on September 27, 2007 to discuss his poor performance. She told him then that he would be terminated if he did not improve within thirty days.[19] Finally, BIMC discharged Di Giovanna on October 29, 2007.[20] The reason for that termination is contested.

The crux of Di Giovanna's complaint is that he was a good performer and a valued employee prior to his filing for FMLA leave. When he raised the issue of FMLA leave with Dakis and Williams, however, he claims that they interfered with his right to apply for and take such leave by discouraging him from applying and/or instructing him not to do so. Then, when Di Giovanna nonetheless exercised his rights, Dakis and Williams conspired to retaliate against him by firing him

---

[16]

*Id.* ¶97; Di Giovanna Dep. 146; Ex. 25 to McEvoy Decl.

[17]

Def. 56.1 St. ¶ 99.

[18]

*Id.* 100. Di Giovanna's 56.1 response to this factual assertion is "Admit, except to state that plaintiff was not denied the pay increase due to alleged poor performance, but instead was denied the pay increase as a means of harassing plaintiff for having taken intermittent FMLA leave time. Pl. 56.1 St. ¶ 100.

[19]

Def. 56.1 St. ¶ 125-26. *See also* Pl. 56.1 St. ¶ 125-26.

[20]

PTO Stipulated Facts ¶ 5.

on the pretext of poor performance.[21]

Defendants paint a starkly different picture.  According to them, Di Giovanna was a problematic employee well before – and well after – he filed for FMLA leave.  They deny having interfered with the exercise of his rights under the FMLA, or having retaliated against him for doing so.  Instead, they maintain that Di Giovanna was terminated for poor job performance after repeated, documented lapses and an explicit warning that he would be fired if his performance did not improve.

*Discussion*

I.    *The Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[22]  In considering a motion for summary judgment, the Court's role "'is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party.'"[23]  Summary judgment should be granted where no reasonable trier of fact could find in favor of the nonmoving party,[24] thus "dispos[ing] of meritless claims before becoming

---

21

    *See generally* Pl. Br. at 2-10.

22

    *E.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986); *White v. ABCO Eng'g Corp.,* 221 F.3d 293, 300 (2d Cir.2000); *see also* FED. R. CIV. P. 56(c).

23

    *Goldberg & Connolly v. New York Cmty. Bancorp, Inc.,* 565 F.3d 66, 71 (2d Cir. 2009) (quoting *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986)).

24

    *James v. New York Racing Ass'n,* 233 F.3d 149, 152 (2d Cir. N.Y. 2000).

entrenched in a frivolous and costly trial."[25]

The Court is mindful that when a case turns on the intent of one party, as employment discrimination claims often do, "a trial court must be cautious about granting summary judgment.[26] However, it is no less true that to survive summary judgment a plaintiff must show that he can meet his ultimate burden, and the Second Circuit has gone "out of [its] way to remind district courts that the impression that summary judgment is unavailable in discrimination cases is unsupportable."[27]

## II.    FMLA Claims

Interfering with, restraining or denying an employee's rights under the FMLA is unlawful.[28]   Employers, moreover, are "prohibited from discriminating against employees or prospective employees who have used FMLA leave."[29]   The Second Circuit recognizes distinct

---

[25]

Tanvir v. N.Y. State Banking Dep't, No. 01 Civ. 0144 (RLE), 2003 WL 22019733, at *4 (S.D.N.Y. Aug. 12, 2003) (citing Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).

[26]

Gallo v. Prudential Residential Servs., Ltd. P'Ship, 22 F.3d 1219, 1223 (2d Cir. 1994).

[27]

Evans v. Consumer Information & Dispute Resolution (CIDR), No. 05 Civ. 8252 (AJP), 2006 WL 1209904, at *8 (S.D.N.Y. 2006) (quoting Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)) (internal quotation marks omitted).

[28]

29 U.S.C. § 2615(a)(1).

[29]

29 C.F.R. § 825.220(c). See also Potenza v. City of New York, 365 F.3d 165, 167 (2d Cir. 2004) (per curium).

8

claims for interference and retaliation under the FMLA.[30]  Di Giovanna asserts both.[31]  Neither has

merit.

A.    *FMLA Interference Claim*

A *prima facie* claim of FMLA interference requires a plaintiff to establish by a

preponderance of the evidence that:

> "(1) she is an eligible employee under the FMLA; (2) defendants constitute an
> employer under the FMLA; (3) she was entitled to leave under the FMLA; (4) that
> she gave notice to defendants of her intention to take leave; and (5) defendants denied
> her benefits to which she was entitled by the FMLA."[32]

To establish an FMLA interference claim, a plaintiff need prove only that an

"'employer in some manner impeded the employee's exercise of his or her right[s]'" protected

provided by the statute.[33]  Di Giovanna here asserts that defendants interfered with his exercise of

his FMLA rights by (1) discouraging him from applying for FMLA leave and from using the leave

once it was approved, (2) telling him that spending more time at work was the only way to improve

his work performance, and (3) terminating him for alleged performance problems that resulted from

---

[30]

    *Shark v. City of New York*, 03 Civ. 2616 (PKC), 2008 WL 4444122, at *4 n.2 (Sept. 29,
2008) (citing *Potenza*, 365 F.3d at 168).

[31]

    Cpt. ¶ 20; Pl. Br. at 12, 21.

[32]

    *Reilly,* 620 F. Supp.2d at 524 (citing *Esser v. Rainbow Advertising Sales Corp.*, 448
F.Supp.2d 574, 580 (S.D.N.Y. 2006)) (collecting cases).

[33]

    *Reilly v. Revlon, Inc.*, 620 F. Supp.2d 524, 534-535 (S.D.N.Y. 2009) (quoting *Sista v. CDC
IXIS North American Inc.*, 445 F.3d 161, 176 (2d Cir. 2006).  *See also* 29 C.F.R. § 825.220
("'Interfering with' the exercise of an employee's rights would include, for example, not only
refusing to authorize FMLA leave, but discouraging an employee from using such leave.");
*Potenza*, 365 F.3d at 167.

the use of his FMLA leave.[34]  He seeks support for his claim by arguing also that defendants

discouraged other employees from exercising their rights under the FMLA.  None of these arguments

has merit.

#### (1)  Alleged Discouraging Statements by Dakis and Williams

Di Giovanna points to several instances in which Williams and Dakis allegedly either

discouraged him from taking or instructed him not to take FMLA leave.[35]  None of the alleged

statements actually supports his claim.

For instance, Di Giovanna testified that, in February, 2007, Dakis "discouraged" him

from and tr[ied] to convince" him not to apply  for FMLA leave.[36]  Specifically, when Di Giovanna

asked her if he should file for FMLA leave, Dakis allegedly told him that "there was no need to, that

another director, Irene Suea, had a mother that was terminal, that passed away and she did not file

---

[34]

Pl. Br. at 24-25.

[35]

*See id.* at 2, 12, 17, Pl. 56.1 ¶ 58; Di Giovanna Dep. 212-13.

[36]

Di Giovanna Dep. 212:3-213-19.

Di Giovanna's account of this purported conversation is sloppy and confusing.  His brief states that he "explicitly asked Ms. Dakis whether a formal leave under the FMLA would be more appropriate in or about *November 2006*, but Ms. Dakis discouraged Plaintiff from filing for FMLA leave."  Pl. Br. at 12.  But the deposition testimony cited in support of this claim deals with Di Giovanna's alleged conversation with Dakis in *February 2007*.  Di Giovanna Dep. 212-213.  Moreover, to the extent that any of his testimony covers November 2006 discussions about leave, that testimony (1) fails to distinguish between Dakis and Williams and, more importantly, (2) says nothing about FMLA leave or either person discouraging him from applying for leave. Di Giovanna Dep. 208:20-210:3.

for FMLA."[37]  Without even inquiring what Dakis meant, Di Giovanna claims that he "understood" Dakis to have been discouraging him from filing for FMLA leave.[38]  Whatever Di Giovanna's actual subjective understanding, however, no trier of fact reasonably could have understood what Dakis allegedly said as discouragement.

Di Giovanna's memorandum of law asserts also that, "despite Ms. Williams' direction not to file for FMLA, [he] opposed her by exercising his rights to file."[39]  This unsworn statement, however, is disingenuous.  There simply is no evidence that Williams "directed" him not to file for FMLA leave.  The most that can be said is that Di Giovanna testified at his deposition that Williams told him that "there was no need to file for FMLA leave."[40]  But, as we have seen, no reasonable juror could regard that statement, assuming it was made, as discouragement let alone a direction not to file.

Weaker still is Di Giovanna's assertion that Williams "interrogated" and "harassed" him with "barrages of questions" about his father's condition at "inappropriate times."[41]  The cited deposition testimony does not support this inflammatory characterization.[42]  Nor does it evidence

---

[37]

Id. 213:3-7.

[38]

Id. 213:16-17.

[39]

Pl. Br. at 12.

[40]

Di Giovanna Dep. 216:13-17.

[41]

Pl. Br. at 18, 24 (citing to Di Giovanna Dep. 279-80).

[42]

The allegedly offensive questions were how Di Giovanna's father was doing and which hospital he was in.  Di Giovanna Dep. 279:13-20, 280:4-7.

11

anything that would have dissuaded a similarly situated employee of ordinary resolve from exercising or attempting to exercise FMLA rights.  Indeed, there is no dispute that Di Giovanna took the days off he wanted when he wanted them.

Finally, Di Giovanna maintains that "[i]n a stark admission by defendants, Ms Williams admitted she was giving plaintiff a bad review *because* he went ahead and filed for FMLA leave."[43]  This assertion twists the testimony cited to support it.[44]  In fact, there is no admissible evidence that Williams made any such admission.

The bottom line here is that there is no evidence that either Dakis or Williams ever told Di Giovanna that she was unhappy that he was seeking or taking intermittent FMLA leave.[45]  Di Giovanna's subjective feelings, assuming he actually had the feelings he now claims he had, about what they actually said are insufficient to constitute interference under the FMLA, and not one of the alleged statements would  have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise FMLA rights."[46]

---

43

   *Id.* at 6 (emphasis added).

44

   *See* Di Giovanna Dep. 158:17-21 (attributing to Williams inquiry as to whether Di Giovanna "could spend more time at work."

45

   Def. 56.1 St. ¶146; Di Giovanna Dep. 250-54.  Di Giovanna contradicts his own deposition testimony on this issue, albeit without citation to the record.  *See* Pl. Br. at 6 ("[c]learly Ms. Williams was upset that Plaintiff had exercised his FMLA rights against her wishes.").   It is well settled that a party may not create a material issue of fact by disputing his own prior sworn testimony.  *Accord United Nat. Ins. Co. v. Tunnel, Inc.,* 988 F.2d 351 (2d Cir. 1993) (party cannot create material issue of fact on summary judgment by submitting affidavit disputing his own prior sworn testimony);  *Forde v. Beth Israel Medical Ctr.*, 546 F. Supp. 2d 142, 151 (S.D.N.Y. 2008) (same).

46

   *See e.g.*, *Golden v. New York City Dept. of Environmental Protection*, 06 Civ. 1587 (DLC) 2007 WL 4258241, at *3 (S.D.N.Y. Dec. 03, 2007) (FMLA interference claim dismissed on

*(2) Spending More Time at Work*

Di Giovanna claims also that Williams discouraged him from exercising his FMLA rights by "often" asking him to spend more time at work.[47]  Williams acknowledges that she once asked Di Giovanna if he could come in early or work late to review PRDN accounts.[48]  Neither this, nor any of the other vague instances in which Di Giovanna alleges that Williams broached the possibility of spending more time at work, is evidence of interference with Di Giovanna's FMLA rights.[49]  Di Giovanna points to no authority that even suggests otherwise.

Moreover, in pursuing this argument, Di Giovanna again misstates the record.  His brief asserts that Williams told him "he could improve his performance by spending more time at work" and, during a June performance meeting, that "the *only way* he could improve his performance was by putting in more hours."[50]  Neither hyperbolic claim is remotely supported by Di Giovanna's

---

summary judgment because plaintiff failed to show that "discouraging" comments by supervisor would have dissuaded a similarly situated employee of ordinary resolve from exercising his FMLA rights).

[47]   Cpt. ¶ 15; Di Giovanna Dep. 140-41, 158-59, 162-65, 253-54.

[48]   Def. 56.1 St. ¶ 91.

[49]   *Cf. Weichman v. Chubb & Son,* 552 F.Supp.2d 271, 289 n.8 (D. Conn. 2008) (concluding that an employer asking an employee to make up lost time is insufficient to support employee's claim of FMLA interference); *New Orleans Jazz & Heritage Festival and Found, Inc.,* 464 F. Supp. 2d 562, 568 (E.D. La. 2006) (holding that employer did not interfere with plaintiff's FMLA rights where plaintiff was sometimes required to reschedule leave in order to attend meetings).

[50]   Pl. Br. at 24 (emphasis added).

13

deposition testimony or by Williams' notes of their meeting, upon which Di Giovanna relies.[51]   As
we have seen, Di Giovanna testified only that Williams, in the context of discussing his performance
review, inquired whether he could spend more time at work.   Nor is his latter assertion accurate.
Williams' notes do not say or even imply that Williams said that putting in more hours was "the only
way" that Di Giovanna could improve his performance.   Moreover, they reflect a litany of specific
suggestions by Williams on how Di Giovanna might have improved his performance, including
"clos[ing] his door and work[ing] on the accounts for a period of undisturbed time."[52]

### (3)    Interference with the FMLA Rights of Other Employees

Di Giovanna's allegations that defendants discouraged other employees from
exercising their FMLA rights[53] are misleading and do not support his claim.

His memorandum asserts, for example, that his former co-worker,  Juan Cabrera,
"testified that Defendants discouraged employees from taking FMLA time off from work."[54]   What
Cabrera actually said, however, was only that "usually in the department it was kind of hard to take
any kind of time off, " and "yes" when Di Giovanna's counsel asked, "[s]o is it fair to say that taking
time off is discouraged."[55]   He did not even mention the FMLA in the testimony cited by Di

---

[51]

     *Id.; See also* Scheiner Affirmation. Ex. L.

[52]

     Schneiner Affirmation., Ex. L.

[53]

     Cpt. ¶¶ 13-14; Di Giovanna Dep. 256-70.

[54]

     Pl. Br. at 7.

[55]

     Cabrera Dep. 7:25-8:2; 9:4-8.

Giovanna.[56]

To be sure, Di Giovanna claimed in his deposition that others were discouraged from taking FMLA leave.  But his claims are based entirely on inadmissible hearsay, "an insufficient basis for opposing summary judgement."[57]  For instance, he claimed that Cabrera "heard about" the case of Ingrid Leer-Charles, and Cabrera's "belie[f] that she requested leave and was denied."[58]  Worse still, Cabrera himself testified that he had no personal knowledge on the subject and did not even know if the leave Leer-Charles purportedly requested was intermittent leave.[59]

Di Giovanna offers also Cabrera's testimony that BIMC employee Martha Chubb's second request for intermittent leave was denied, a fact Cabrera claims he learned from an email sent by Liberty Mutual.  Again, the assertion is based on inadmissible hearsay evidence.  Moreover, Cabrera testified that the email did not state a reason for the denial and that he had *no idea why* the request was denied.[60]

Finally, Di Giovanna claims that co-worker Karen Ferrell approached him for advice about her own FMLA request and that "[a]pparently Ms. Williams had also given [her] a hard time

---

[56]   *See* Pl. Br. at 7; Cabrera Dep. 6-7, 9-10.

[57]   *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005).  *See also* FED. R. CIV. P. 56(e)(1) (requiring affidavits opposing summary judgment to "set out facts that would be admissible in evidence").

[58]   Cabrera Dep. 11:22-24.

[59]   *Id*. 11:19-12:8.

[60]   *Id*. 12:22-13-25 (emphasis added).

15

with her FMLA request."[61]   His unsworn memorandum contends that Williams denied Ferrell's request for intermittent FMLA leave "specifically because Ms. Ferrell was unable to provide the dates on which she would be missing work."[62]   But Di Giovanna's claim is unsupported by admissible evidence.

As an initial matter, Di Giovanna's Rule 56.1 Statement admits – contrary to the suggestion in his memorandum – that Ferrell's request for FMLA leave was granted, although he claims that this had not occurred by the time he had been terminated.[63]   Ferrell, moreover, testified that her request was granted[64] and submitted an extensive affidavit stating that Williams did not give her a "hard time" about and in fact granted that request.[65]   The only "evidence" to the contrary is Di Giovanna's deposition testimony to the effect that Ferrell told him that Williams had denied her request for FMLA leave.[66]   And this is insufficient to raise a genuine issue of fact, let alone a genuine issue of material fact.

First, Di Giovanna's testimony as to Ferrell's alleged statement is hearsay – he offers it to prove the truth of Ferrell's alleged out of court statement.  Inasmuch as Ferrell was a co-worker

---

[61]

 Cpt. ¶ 13.

[62]

 Pl. Br. at 8.

[63]

 *Compare* Def. 56.1 St. ¶ 150 *with* Pl. 56.1 St. ¶ 150.

[64]

 Ferrell Dep. 5:13-18.

[65]

 Ferrell Aff. ¶¶ 19-22.

[66]

 DiGiovanna Dep. 274:19-275:19.

and there is no evidence that she had anything to do with any decisions regarding FMLA leave for Di Giovanna, Ferrell's alleged statement was not within the scope of her employment and therefore not a vicarious admission by the defendants.[67]  In any case, even if Ferrell's alleged statement to Di Giovanna were admissible, it would be immaterial, especially in view of the fact that Ferrell's experience, whatever it was, is collateral to plaintiff's claim and in case does not support Di Giovanna in light of the fact that it is undisputed that she obtained the leave she requested.

Lastly, the unsupported allegations of interference with employees other than Di Giovanna are belied also by defendants' uncontested assertion that at least four other employees in patient financial services took intermittent FMLA leave between March 2005 and June 2008 and then returned to work full time.[68]  Di Giovanna's only rebuttal to this fact is his oft-repeated, inadequate refrain, "deny knowledge and information."[69]

### (4)    Termination

Di Giovanna argues that summary judgment should be denied "because a reasonable trier of fact could find that [he] was terminated due to alleged performance problems that resulted

---

[67]

*E.g., Evans v. Port Auth. of N.Y. & N.J.,* 192 F. Supp.2d 247, 261-64 (S.D.N.Y. 2002); *accord, e.g., Phipps v. Comp. Comm. Devel.Corp.,* No. 00 Civ. 6063(RJH), 2005 WL 287413, at *13 & n.10 (S.D.N.Y. Feb. 4, 2005) (adopting *Evans* analysis); *Greaves v. St. Luke's/Roosevelt Hosp. Center,* 03 Civ., 7424 (SAS), 2005 WL 627635, at *1 n.12 (S.D.N.Y. Mar. 17, 2005).

[68]

Def. 56.1 St. ¶ 151; Toia Aff. ¶ 2.

Worth noting is that this fact alone might have been sufficient to kill plaintiff's *prima facie* case on prong four.  *See Smith v. Planas*, 975 F. Supp. 303, 308 (S.D.N.Y. 2007).

[69]

Pl. 56.1 St. ¶ 151.

from the very use of his FMLA leave."[70]   As indicated by the short shrift he gives it in his memorandum, this really is no more than an effort to dress Di Giovanna's retaliation claim in (barely) different clothing.  In any event, as will appear, the claim that Di Giovanna was terminated because of problems resulting from his use of FMLA leave is entirely unsupported by the record.

*     *     *

In sum, it is undisputed that (1) Williams signed Di Giovanna's FMLA leave request,[71] (2) the request was granted, (3) Williams or Dakis signed every subsequent leave request he made[72] and (4) there is no admissible evidence that either person ever told him he could not or should not take off the day he requested.  Di Giovanna has not adduced any evidence of any statement by Dakis or Williams that would have dissuaded a similarly situated person of ordinary resolve not to exercise his rights under the FMLA.  The record therefore is devoid of evidence that could support the claim that defendants interfered with Di Giovanna's FMLA rights.

B.     *FMLA Retaliation*

FMLA retaliation claims are analyzed under the familiar burden shifting framework established in *McDonnell Douglas Corp. v. Green.*[73]

Plaintiff bears the initial burden of establishing a *prima facie* case of retaliation.  If

---

[70]

Pl. Br. at 24-25.

[71]

Def. 56.1 St. ¶ 71

[72]

Di Giovanna Dep. 255:11-17.

[73]

411 U.S. 792 (1973).  *Potenza,* 365 F.3d at 168.

18

he meets this burden, a presumption of retaliation is created and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination.[74]  If the employer does so, the presumption of discrimination is rebutted and "simply drops out of the picture."[75]  "The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason."[76]  To satisfy this burden, the plaintiff may rely on evidence presented to establish the *prima facie* case, as well as additional evidence, which may include direct or circumstantial evidence of discrimination.[77]

### 1.    *A Prima Facie Case of Retaliation*?

In order to make out a *prima facie* case of retaliation under the FMLA, plaintiff must adduce evidence  that (1) he exercised rights protected under the FMLA, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the adverse employment action

---

[74]

*Farias v. Instructional Sys.*, 259 F.3d 91, 98 (2d Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. at 802-03); *Muhleisen v. Wear Me Apparel LLC*, 07 Civ. 8748 (NRB), 2009 WL 2355784, at *5 (S.D.N.Y. July 30, 2009).

[75]

*St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11 (1993); *see also James,* at 154.

[76]

*Forde v. Beth Israel Med. Center*, 546 F. Supp. 2d 142, 149 (S.D.N.Y. 2008) (citing *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120-21 (2d Cir. 1997).

[77]

*Muhleisen*, 2009 WL 2355784, at *5 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003); *Harris v. City of New York*, No. 03 Civ. 6167(DLC), 2004 WL 2943101, at *2 (S.D.N.Y. Dec. 21, 2004).

occurred in circumstances giving rise to an inference of retaliatory intent.[78]

Defendants challenge the fourth element and maintain that the retaliation claim must be dismissed because plaintiff's termination does not give rise to an inference of retaliatory intent.

Di Giovanna's evidence in support of a *prima facie* case is at best anemic.  However, his burden at this first step is minimal,[79] and the short time interval between his filing for FMLA leave and his termination may be  sufficient to satisfy it.[80]  But the Court will assume, without deciding, that plaintiff has established a *prima facie* case, thus making it unnecessary to decide the issue.[81]

### 2.     Step 2 – Legitimate Reason for Discharge?

Defendants have satisfied their burden at step two by articulating a non-retaliatory reason for terminating Di Giovanna.  Specifically, they assert that Di Giovanna was terminated for

---

[78]

*Potenza*, 365 F.3d at 168.  *See also McFarlane v. Chao*, No. 04 Civ. 4871(GBD), 2007 WL 1017604, at *20 (S.D.N.Y. 2007).

[79]

*See Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) ("burden of proof that must be met to establish a prima facie case is minimal") (citing *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 199 (2d Cir.1999); *Fisher v. Vassar College*, 114 F.3d 1332, 1337 (2d Cir. 1997) (same); *Marron v. New York City Campaign Fin. Bd.*, No. 02 Civ. 5562 (LAK), 2004 WL 1144206, at *2 (S.D.N.Y. May 21, 2004) (same).

[80]

*Mucci v. St. Mary's Hosp., Inc.*, 2008 U.S. Dist. LEXIS 109363, at *13-15 (D. Conn. Sept. 18, 2008)

[81]

*E.g.*, *Brown v. Pension Bds.*, 488 F. Supp. 2d 395 (S.D.N.Y. 2007) (bypassing *prima facie* question and proceeding right to the ultimate issue) (citing *Moorehead v. New York City Transit Auth.*, 385 F. Supp. 2d 248, 253-54 (S.D.N.Y. 2005) (assuming a *prima facie* case and proceeding directly to the "ultimate issue").  *See also Jalal v. Columbia Univ.*, 4 F. Supp. 2d 224, 234 (S.D.N.Y. 1998) (declining to "dance mechanistically through the McDonnell Douglas . . . 'minuets'" and proceeding directly to the ultimate issue)).

various, documented instances of poor performance, many of which predated his FMLA application.[82]

    3.    *Step 3 – Proof that FMLA Leave was the Real Reason for the Termination?*

The ultimate question at this final stage is whether Di Giovanna adduced admissible evidence that would permit a reasonable jury to find that his termination was motivated by having filed for intermittent leave under the FMLA.[83]  "[T]he mere establishment of a *prima facie* case in the face of a proffered reason for the adverse employment action is not necessarily a sufficient quantum of evidence to warrant submission to a jury."[84]  Indeed, courts may – and regularly do – grant summary judgment dismissing claims at step three even after concluding – or accepting for argument's sake – that the plaintiff had established a *prima facie* case at step one.[85]

---

[82]

    *See* Def. Br. at 4-7, 9-18, 23-24; *see also e.g.*, Def. 56.1 St. ¶¶ 34-41 (detailing problems that arose when Di Giovanna ran PRDN unit in Williams' absence, culminating in his replacement when Williams returned); ¶¶52-54 (accounts receivable too high in BCBS and CCMC units, and Di Giovanna told that his staff's performance in those units needed to improve); ¶¶ 54-57 (twelve quality reviews completed between January and April 2007 cite fifteen of Di Giovanna's supervisors and staff members for various performance problems); ¶¶ 81-84 (Di Giovanna failed to follow Williams' direction regarding the review of denied claims); ¶ 96 (Di Giovanna failed to reviewed the denied accounts in a timely fashion); ¶¶ 115–116 (took six weeks to complete a priority project).

[83]

    *Fields.* 115 F.3d at 119 (citing *St. Mary's Honor Center,* 509 U.S. 502; *see also Marron*, 2004 WL 1144206, at *1; *Daly v. Presbyterian Hosp.*, 98 Civ. 4253 (NRB),2000 WL 8268, at *4 (S.D.N.Y Jan. 3, 2000).

[84]

    *Casanova v. General Mills Restaurants Inc.,* No. 94-CV-4386 (FB), 1997 WL 473840, *3 (E.D.N.Y. Aug 15, 1997) (citing *Fisher v. Vassar College*, 114 F.3d 1332, 1337 (2d Cir. 1997).

[85]

    *Schnabel*, 232 F.3d at 91 (affirming summary judgment despite finding of *prima facie* case because "plaintiff has presented no evidence upon which a reasonable trier of fact could base the conclusion that [discrimination] was a determinative factor in defendants' decision to fire

To defeat summary judgment, Di Giovanna need not show that defendants' proffered reason was false or played no role in the decision to terminate him, but only that it was not the only reason, and that his filing for FMLA leave was at least one motivating factor.[86]  To determine this, the court must use a case by case approach that evaluates "'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case.'"[87]  Di Giovanna cannot prevail in these circumstances.

The Court notes at the outset that much of Di Giovanna's retaliation claim rehashes the evidence and argument that he relied upon in attempting unsuccessfully to defeat summary judgment dismissing his interference claim.[88]  Those arguments need not be revisited.  Suffice it to say that there is no admissible evidence of any attempt to discourage or interfere with, nor animus against Di Giovanna or anyone else based upon, the exercise of FMLA rights.  To defeat summary judgment on his retaliation claim, Di Giovanna was obliged to come forward with some other

---

him").  *See also e.g.*, *Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 290 (D. Conn. 2008); *Watson v. Arts & Entm't TV Network*, 04 Civ. 1932 (HBP), 2008 WL 793596, at * 16-17 (S.D.N.Y. 2008); *Dodson v. CBS Broad. Inc.*, 2004 WL 1336231, at 20 and n.5 (S.D.N.Y. June 15, 2004) (collecting Second Circuit cases granting summary judgment at *McDonnell Douglas* step three).

[86]    *Marron*, 2004 WL 1144206, at *1 (citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 78 (2d Cir. 2001)).

[87]    *Matlosz v. J.P. Morgan Chase*, 03 Civ. 6235 (JGK), 2005 WL 2242196, at *6 (S.D.N.Y. Sept. 3, 2005) (alteration in original) (quoting *James,* 233 F.3d at 156 (quoting *Reeves*, 530 U.S. at 148-49); *see also Schnabel* 232 F.3d 83 (2d Cir. 2000); *Marron*, 2004 WL 1144206 at *5 (quoting *Reeves*, 530 U.S. at 148-49).

[88]    *See e.g.*, P. Br. at 16-21.

evidence that he was terminated at least in part because he exercised his FMLA rights.  As will appear, he has failed to do so.

### (1)     Poor Performance as Pretext

Di Giovanna argues his alleged poor performance was a pretext for terminating him, and that summary judgment is thus inappropriate.[89]  Specifically, his memorandum argues that he was a good performer unaware of any performance problems before he applied for FMLA leave and that Williams' letter of recommendation and his 2006 demonstrate pretext.  Once again, Di Giovanna employs a misleading portrayal of the record and facts insufficient to create a genuine issue of material fact.

### a.     Evidence Poor Performance Before and After FMLA

Di Giovanna claims that "[d]efendants offer no evidence of Plaintiff's alleged 'bad performance.'"[90] This is patently untrue.

Defendants' Rule 56.1 statement and supporting evidence provide a litany of examples of Di Giovanna's sustained poor performance at some of the most basic functions of his job that long predated his application for FMLA leave.  Di Giovanna's response in many instances does not actually dispute the specific assertions of poor performance, but instead contends that hwas

---

[89]

E.g., DeMarco v. Stony Brook Clinical Practice Management Plan, No. 06 Civ. 4305 (JG), 2008 WL 4240023, at *16 (E.D.N.Y., Sept. 15, 2008) (plaintiff can survive summary judgment by presenting "evidence from which a rational jury could conclude that the proffered reason was a pretext for a retaliatory animus").

[90]

Pl. Br. at 19.

unaware at the time of the problem or criticism alleged.[91]  Other times, Di Giovanna purports to

dispute the factual assertion but the evidence he relies upon in doing so does not actually support his

position.  In still other cases, he acknowledges the asserted act but argues with defendants'

characterization of it as poor performance.[92]  Finally, in yet other instances, he concedes the fact but

argues in an extremely conclusory fashion, that whatever defendants say was pretextual[93]

       None of these evasions raises a material issue of fact sufficient to defeat summary

judgment.  Instead, they have left a largely unchallenged record that Di Giovanna was failing at

various basic aspects of his job well before his FMLA application, that he continued to have

problems after he applied, and that defendants explicitly warned him to improve or face termination.

Di Giovanna's real quarrel, it appears, is with defendants' assessment of how best to assign work to

and manage their employees and with their assessment of the quality of his work.  Such a quarrel is

---

[91]

       *E.g.*, Pl. 56.1 St. ¶ 55 (denying personal knowledge of the twelve quality reviews of his staff made between January and April 2007, and citing to a blanket statement in his affidavit that he never was advised of any deficiencies in his performance); ¶ 56 (defendants assert that problems with Di Giovanna's staff helped slow the collection of money to the hospital, which Di Giovanna "denies" on the ground that "he was never made aware of the alleged slowing of collection of money by defendants before he filed for FMLA leave); ¶¶ 115-16 (admitting to taking six weeks to complete a project that was to have been handled "ASAP," but asserting that "at no time was he told that he was working too slowly or not doing his job adequately").

[92]

       *E.g.*,  ¶¶ 36-37 (denying that PRDN unit was failing to meet standards under his control by arguing that standards were met unless "unless reassigned to other work"); ¶ 39; ¶ 42 (relying on non-responsive affidavit testimony to deny defendants' claim that his poor supervision resulted in problems for the PRDN unit );  ¶ 120 (defendants assert that Di Giovanna failed to give a subordinate a project to work on by a certain date and Di Giovanna denies that he "'failed'" to give her the project but admits that he "made a decision as a Manager" not to give it to her).

[93]

       *E.g.*, ¶ 125 (Di Giovanna admits that Williams met with him on September 27, 2007 about his continuing poor performance and told him he would be fired if he did not improve, but argues that Williams was "harassing [him] and "trying to create a pretextual reason to terminate" him.

24

immaterial here.[94]


b.      *Letter of Recommendation*

Di Giovanna argues that Williams' April 2007 letter of recommendation demonstrates that Williams recognized the high quality of his work just a month before he applied for FMLA leave, and thus showed that his termination for poor performance was mere pretext.  This dog will not hunt.

To be sure, the letter, drafted by Di Giovanna himself praises him and his leadership skills.[95] But it does not support his retaliation claim.  The undisputed evidence shows that Dakis and Williams regularly criticized and documented Di Giovanna's performance woes well before April 2007.  Morever, the letter speaks in highly generalized terms that do not contradict or undermine defendants' detailed examples of his poor performance before and after May 2007.  It does not tend to show pretext or offer any support for Di Giovanna's claim that his performance was free of problems before May 2007 and that defendants launched a pretextual campaign to retaliate against him only when he filed for FMLA leave.  After all, as noted previously, Di Giovanna himself acknowledged or failed to deny many of the performance problems cited by defendants.


c.      *The 2006 Raise*

---

[94]

*E.g., Ennis v. Sonitrol Mgmt. Corp.,* No. 02 Civ. 9070 (TPG), 2006 WL 177173, at *18 (S.D.N.Y. Jan. 25, 2006) ("employee may be discharged on the basis of subjective business judgments for any reason that is not discriminatory or retaliatory) (citing *Fierro v. Saks Fifth Ave*, 13 F. Supp. 2d 481 (S.D.N.Y. 1998). *See also Thornley v. Penton Publ.*, 104 F.3d 26, 29 (2d Cir. 1997).

[95]

*See* McEvoy Decl. Ex. 10 to Di Giovanna Dep.

Di Giovanna claims that Williams told him in early 2006 that he was "doing a great job" and gave him a $3,000 salary increase.[96]  As with the letter of recommendation, the argument is that the raise belies any claim by defendants that William was fired for poor performance.  But this is weaker still.

First, the purported raise was given over a year before Di Giovanna was terminated, well before both the vast majority of the performance lapses cited by defendants and his thirty-day warning.  Relatedly, Di Giovanna's own account of the reason behind the salary increase  – his 'doing a great job' – does not raise a genuine issue of material fact as to any of the specific criticisms of his poor performance, many of which Di Giovanna does not even dispute.  Quite simply, even if his version of why he received it is true, the 2006 raise would not support a claim of retaliation for exercising his FMLA rights because it was too remote in time.

### (2)    Di Giovanna's Leave History

When viewed in the context of the entire record, as it must be at this stage, it becomes clear that Di Giovanna's retaliation claim is baseless.

Between November 2006 and May 17, 2007, Di Giovanna took twenty-seven days off with Dakis's or Williams' approval,[97] "mostly all" of them to care for his father.[98]  When asked if either Dakis or Williams had a problem with him taking this time off during this period, Di

---

[96]

Pl. Br. at 14; Di Giovanna Dep. 89-90.

[97]

Def 56.1 St. ¶ 51; Dakis Aff. ¶ 65, Ex. 10 (copy of Di Giovanna's requests for time off during this period).

[98]

Di Giovanna Dep. 210:25-211:1.

Giovanna replied, "Not at all."[99]  Meanwhile, during his six months of eligibility for intermittent FMLA leave prior to his termination, Di Giovanna took only seven days off.[100]

These undisputed facts belie Di Giovanna's unsupported "feeling" that defendants terminated him in retaliation for filing for FMLA leave because that leave was interfering with his work or because "they were annoyed because they perceived that [his] FMLA leave inconvenienced them."[101]  This is particularly true considering that Di Giovanna claims that the campaign to retaliate against him began at least as early as June 26, when Williams criticized him for his handling of PRDN accounts.[102]  By that date, Di Giovanna had taken only *one day* of intermittent FMLA leave.[103]

To accept Di Giovanna's claim then, one would have to believe that, after having no problem "at all" with his taking off  roughly twenty-seven days to care for his father before May 17, Dakis and Williams decided to punish Di Giovanna for taking one day of FMLA leave by setting up an elaborate, months-long scheme to gin up evidence of poor performance in order to terminate him. This theory defies credulity and finds no support in the record.

---

[99]
     *Id.* 211:23-212:2.

[100]
     56.1 St. ¶ 75; Di Giovanna Dep. 248; Dakis Aff. ¶ 65, Ex. 11 (copy of Di Giovanna's time off requests and "Intermittent Leave Time Tracking Reports" for that period).

[101]
     Pl. Br. at 24.

[102]
     Def. 56.1 St. ¶ 84;  *See also* Di Giovanna Dep. 248-249.

[103]
     Dakis Aff. ¶ 65, Ex. 10 (according to the contested reports submitted by defendants, June 29 Di Giovanna's first day of FMLA leave).

(3)     *Other Employees*

Finally, consistent with his approach to his case, Di Giovanna's memorandum contains one sentence alleging that "during his tenure with Defendants there was an incident in the billing department with an employee who filed for intermittent leave and was then terminated."[104] This assertion apparently is based on a statement allegedly made to Di Giovanna by Linda Traister, BIMC's director of billing, to the effect that another employee who had been on intermittent FMLA leave had been terminated.[105]  But Di Giovanna admitted at his deposition that he had no evidence to support a suggestion that the termination of that unnamed employee violated the FMLA.[106]

*          *          *

In sum, Di Giovanna has presented no evidence upon which a reasonable trier of fact could base the conclusion that his exercising his rights under the FMLA was a motivating factor in the decision to terminate him.

C.     *Opposition to Interference with FMLA Rights*

Di Giovanna's third cause of action alleges that defendants terminated him because he opposed interference with his own FMLA rights and with the FMLA rights of others.  Di Giovanna has offered no evidence that he ever opposed any alleged interference with his or anyone

---

[104]

Pl. Br. at 9; 304:11-21.

[105]

Di Giovanna Dep. 304:11-21.

[106]

Di Giovanna Dep. 305:2-15.

28

else's FMLA rights.[107]   Furthermore, he has made no attempt to rebut defendants' motion for summary judgment on this point.  Indeed his opposition papers do not even mention the claim.

Accordingly, Di Giovanna has abandoned this claim.[108]

*Conclusion*

For the foregoing reasons, defendants' motion for summary judgment dismissing the complaint (DI 30) is granted in its entirety.  The Clerk shall enter judgment and close the case.

SO ORDERED.

Dated:        September 8, 2009

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[107]

Def. Br. at 32-34.

[108]

*See, e.g.., Bellegar de Dussuau v. Blockbuster, Inc.*, No. 03 Civ.6614(WHP), 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006) (claim abandoned by plaintiff's failure to address it in opposition to defendant's summary judgment motion) (citing *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998)); *DeVito v. Barrant*, No. 03 Civ. 1927 (DLI), 2005 WL 2033722, at *10 (E.D.N.Y. Aug. 23, 2005); *Anti-Monopoly, Inc., v. Hasbro, Inc.*, 958 F.Supp. 895, 907 & n. 11 (S.D.N.Y. 1997) ("failure to provide argument on a point at issue constitutes abandonment of the issue"), *aff'd*, 130 F.3d 1101 (2d Cir.1997); *cert. denied*, 525 U.S. 813.  *See also* S.D.N.Y. CIV. R. 7.1 ("[A]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . in opposition to the motion . . . . Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default.").